**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

---

B.M.B.,

Plaintiff,

v.

State Farm Fire and Casualty Company,

Defendant

Civ. No. 01-355 (RHK/AJB)
**ORDER OF CERTIFICATION**

---

Robert J. Hennesey and Mark H. Zitzewitz, Lindquist & Vennum PLLP, Minneapolis, Minnesota, for Plaintiff.

C. Todd Koebele and Wiliam L. Moran, Murnane, Conlin, White & Brandt, Saint Paul, Minnesota, for Defendant.

---

The above-entitled matter is before the Court following its December 4, 2002 Memorandum Opinion and Order granting in part Defendant State Farm Fire and Casualty Company's ("State Farm") Motion to Certify Questions to the Minnesota Supreme Court. That order is attached hereto as Exhibit A and incorporated herein by reference. This Court, pursuant to section 480.065 of the Minnesota Statutes, certifies to the Supreme Court of the State of Minnesota the following question of law:

> Where insurance coverage is being or has been sought for personal injury or bodily harm resulting from an insured's non-consensual sexual contact with another, can the trial court submit to a jury the question of whether the insured's acts were "unintentional" because of mental illness as set forth in the holding of State Farm Fire & Cas. Co. v. Wicka, 474 N.W.2d 324 (Minn. 1991) and therefore outside the scope of an insurance policy's intentional act exclusion, or must the court infer the insured's intent to cause injury as a matter of law?

JAN 0 9 2003
FILED
RICHARD D. SLETTEN, CLERK
JUDGMENT ENTD
DEPUTY CLERK

This Court acknowledges that the Supreme Court of the State of Minnesota, acting as the receiving court, may reformulate the question of law.

The December 4, 2002, Memorandum Opinion and Order directed the parties to meet and confer in an effort to arrive at an agreed-upon statement of the facts relevant to the certified question of law. The Court further directed the parties to submit either a joint statement of facts or, if they could not agree on the relevant facts, individual proposed statements of facts. The parties did not agree upon a statement of relevant facts. Accordingly, pursuant to subdivision 6(b) of section 480.065 of the Minnesota Statutes, this Court determined the relevant facts to be those set forth immediately below.

## I. STATEMENT OF FACTS

### A. The Parties

Plaintiff B.M.B. was born on May 5, 1982, and currently resides in Arizona. In June of 1992, as a ten-year-old, she visited her uncle Ronald K. Halliday (Halliday), then a practicing anesthesiologist in Faribault, Minnesota,[1] his then-wife Bonny, and their two daughters, Grace and Alexis. During that two-week visit, Halliday sexually abused B.M.B. on one occasion, performing oral sex on her.

State Farm is an insurance company doing business in Minnesota. At the time the

[1]The Minnesota Board of Medical Practice revoked Halliday's medical license after discovering his criminal conviction and other instances of sexual abuse. See B.L.H. v. Northwestern Mut. Life Ins. Co., 92 F. Supp. 2d 910, 912 (D. Minn 2000) (Alsop, J.) (giving factual background with respect to Halliday's medical license revocation).

abuse of B.M.B. occurred, Halliday was a named insured under a Personal Liability Umbrella Policy ("the Policy") issued by State Farm. In 1995, Halliday sought coverage under this umbrella policy after Plaintiff B.M.B.'s parents, on her behalf, commenced a civil action against him in state court arising from his sexual abuse of B.M.B. Following a jury verdict in B.M.B.'s favor, Halliday assigned his interests in the State Farm policy to her. She thereupon brought the above-captioned litigation against State Farm, alleging that the insurance company had breached its contract in refusing to provide coverage for Halliday under the terms of the umbrella policy.

## B. Facts Pertaining to Halliday's Sexual Abuse of B.M.B. and Others

In March 1994, Halliday's wife discovered him sexually abusing their older daughter, who was eight years old at the time. Halliday was charged with three counts of criminal sexual conduct arising out of the abuse of his eight-year-old daughter. In May 1994, pursuant to the recommendation of his then-treating psychiatrist, Dr. Charles McCafferty, Halliday participated in an intake assessment at Alpha Human Services ("Alpha House") for a psychological evaluation. The intake coordinator noted that Halliday had engaged in behaviors which he knew could jeopardize a desirable career that he had worked very hard to obtain, suggesting a lack of control. Alpha House recommended Halliday's admission to its sex offender treatment program.

Halliday pled guilty to one count of criminal sexual conduct in the first degree for his conduct involving his older daughter. During his allocution, Halliday stated that he

was not making any claim that he was under any mental or physical disability at the time of the incident as to which he was pleading guilty. He was sentenced to 365 days in the Rice County jail and a term of thirty years probation. Halliday also pled guilty in North Dakota to gross sexual imposition relating to his sexual abuse of another young girl. He served his sentence for that crime concurrently with the sentence for criminal sexual conduct in Minnesota.

As part of his sentence in Minnesota, the district court ordered Halliday to complete the sex offender treatment program at Alpha House. The court also ordered Halliday to submit to random polygraph tests while at Alpha House to insure compliance with the treatment program. Alpha House admitted Halliday on an in-patient basis in June 1995. While in treatment, Halliday admitted to sexually abusing over thirty victims. In addition to abusing his two daughters and B.M.B., Halliday admitted to abusing other female children and twenty-six female patients between the ages of 14 and 40, whom he had fondled while they were under anesthesia. Halliday testified that, within a year of moving to Faribault in 1990, he had stopped abusing female patients and abused no patients between 1991 and 1994. During that time period, however, he had abused his elder daughter in excess of 300 times.

Halliday testified that he had never sexually abused someone to whom he had not previously talked or with whom he had not previously had contact. In 1996, Halliday described in part his thoughts and feelings regarding his abuse of women and female

children as follows:

> I begin planning how to manipulate women and female children into allowing me to sexually abuse them. I manipulate every woman and female child between the ages of 4 and 55 that I come in contact with. Every interaction that I have with them I use to groom them to become a victim. I set up opportunities to be alone with women and children or to have an excuse to touch them in some way. Every word, every look, every action is meant to entice them into allowing me to abuse them.

Several of Halliday's victims were subjected to multiple occasions of abuse. For example, Halliday stated that he sexually abused one of his daughters approximately 630 times over the course of four years. Halliday also disclosed a pattern of frequent masturbation – engaging in that conduct up to six times a day. Much of his masturbatory conduct involved fantasies about his victims.

In a deposition, Halliday described the sequence of events that led him to abuse B.M.B. Halliday put B.M.B. to bed every night during her two-week visit. One night, Halliday entered B.M.B.'s bedroom and asked whether she wanted a massage. He then removed B.M.B's underwear and performed oral sex on her. Halliday later acknowledged that his conduct toward B.M.B constituted sexual abuse and that he abused B.M.B because the opportunity presented itself.

In the litigation brought by B.M.B.'s parents against him, Halliday admitted to his sexual contact with B.M.B. on one occasion. The state court consolidated B.M.B.'s case with the lawsuit Halliday's wife filed on behalf of her daughters. At trial, Halliday testified that he had sexually abused both of his daughters and B.M.B. He also agreed

that his actions showed that he acted with willful indifference and in deliberate disregard for the rights and safety of B.M.B. Halliday has never asserted that he was suffering from a mental illness when he sexually abused B.M.B.

B.M.B. has presented expert testimony in the above-captioned litigation from Dr. Thomas Gratzer, a psychiatrist. Dr. Gratzer opines that Halliday had psychiatric disorders at the time of his sexual abuse that prevented him from controlling his actions. Dr. Gratzer based his opinions on his review of Halliday's record of treatment, court history, and his own examination of Halliday. Specifically, Dr. Gratzer provided the following diagnosis and opinion:

> In my opinion, Mr. Halliday's aberrant sexual behaviors are a function of his sexual disorders. He shows a multiplicity of sexual disorders: pedophilia, voyeurism, paraphilic disorder n.o.s., and sexual disorder n.o.s. Mr. Halliday's offense pattern is consistent with his paraphilic disorders and indicates a substantial lack of control.

(Aff. of Mark H. Zitzewitz, Ex. B.) Dr. Gratzer's diagnostic impressions used the criteria set forth in the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders, Current Edition (DSM-IV). State Farm has presented expert testimony from George B. Palermo, M.D., a psychiatrist, in which Dr. Palermo opines that Halliday could control his acts of sexual abuse against B.M.B. in 1992. A genuine issue of material fact exists as to whether, due to a mental illness or impairment, Halliday could control his actions vis-a-vis his sexual abuse against B.M.B.

## C. The Pertinent Policy Language

The Policy provides:

> 1. Coverages L–Personal Liability. If you are obligated to pay damages for a *loss*, we will pay your net loss minus the retained limit. . . .
> 2. Defense and Settlement.
>    b. When the claim or suit is covered by this policy but not covered by any other policy available to you:
>       (1) we will defend the suit against you;

A *loss* is defined as "an *accident* that results in *personal injury* or property damages during the policy period." The Policy defines *personal injury* as including the following four categories of injury:

> (a) bodily harm, sickness, disease, mental anguish, or mental injury . . .
> (b) false arrest, false imprisonment, wrongful eviction, wrongful detention, malicious prosecution or humiliation;
> (c) libel, slander, defamation of character, or invasion of rights of privacy; and
> (d) assault and battery.

Under the Exclusion section, the Policy contains an intentional act exclusion, which provides:

> We will not provide insurance:
> * * *
> 2. for personal injury or property damage:
>    a. which is either expected or intended by you; or
>    b. to any person or property which is the result of your willful and malicious act, no matter at whom the act was directed.

## D. Procedural History

In June 1995, B.M.B.'s parents, on her behalf, (collectively "Claimants")

commenced a civil lawsuit against Halliday in Rice County District Court. At the same time, Halliday's wife brought a similar suit against him relating to his abuse of their two daughters. In the underlying B.M.B. complaint, Claimants alleged seven causes of action against Halliday: (1) assault and battery; (2) incestuous abuse; (3) intentional infliction of emotional distress; (4) negligent infliction of emotional distress; (5) false imprisonment; (6) invasion of privacy; and (7) restitution for out-of-pocket expenses. (Id. Ex. 7.) Claimants brought the action as a result of Halliday's "physical and sexual abuse of [B.M.B.] when she was a minor child at the age of 10." They alleged that, at the time of the abuse, Halliday had control over B.M.B. and that he "intentionally, maliciously, and with reckless disregard inflicted injury on B.M.B. through intentional, malicious, unjustified, harmful, and offensive sexual contact without her consent." (Id. ¶¶ 6, 9.)

Halliday sought coverage from State Farm under his umbrella policy as well his homeowner's policy. After completing an investigation, State Farm declined to provide coverage for Halliday under either policy. State Farm denied coverage, questioning whether (1) there had been a "loss" under the policy, (2) the alleged incidents had resulted in personal injury, and (3) the incidents were "expected or intended" by Halliday or were the result of "willful and malicious" acts by Halliday.

The jury returned a verdict against Halliday and awarded B.M.B. $100,000 in compensatory damages (later reduced by the court to $95,000) and $1,500,000 in punitive damages. The jury also awarded Halliday's daughters $1,950,000 in compensatory

damages and $7,000,000 in punitive damages. In a post-trial Order, the district court judge analyzed whether a punitive damage award was appropriate and concluded that there was sufficient evidence to justify such an award against Halliday. The trial judge specifically found that Halliday's

> pattern of sexual abuse continued over a period of at least four years until he got caught. For a long time, Defendant maintained that he had only abused his daughter Grace a few times over a six month period, but he later admitted sexually abusing her some 633 times over four years. Until about a week before trial, Defendant continued to deny he had ever sexually abused his younger daughter or his niece. During therapy, Defendant admitted sexually abusing 26 patients while they were under anesthesia, but he has been unwilling or unable to identify who they were.

In June 1999, Halliday assigned to B.M.B.'s parents his rights, if any, to proceeds under the State Farm umbrella policy. B.M.B.'s attorney set a demand letter to State Farm asserting that Halliday suffered from a mental illness at the time he abused B.M.B. in 1992 and claiming that, accordingly, the Policy's exclusion for expected or intended acts did not apply. State Farm did not alter its position that coverage did not exist, and B.M.B. brought the above-captioned lawsuit against State Farm.

On September 30, 2002, this Court denied State Farm's Motion for Summary Judgment. State Farm argued that (1) the policy contained an "intentional act" exclusion precluding coverage for personal injury that was "either expected or intended by [Halliday]," and (2) in Minnesota, the requisite intent for purposes of an intentional act exclusion is inferred as a matter of law in cases of non-consensual sexual contact. Therefore, State Farm contended, the intentional act exclusion applied and the company

had no duty under the policy either to defend or to indemnify Halliday.

In deciding State Farm's motion, the Court considered State Farm Fire & Casualty Co. v. Wicka, 474 N.W.2d 324 (Minn. 1991), which held that

> for the purposes of applying an intentional act exclusion contained in a homeowner's insurance policy, *an insured's acts are deemed unintentional* where, because of mental illness or defect, the insured does not know the nature or wrongfulness of an act, or *where, because of mental illness or defect, the insured is deprived of the ability to control his conduct regardless of any understanding of the nature of the act or its wrongfulness.*

Wicka, 474 N.W.2d at 331 (emphasis added). The Court determined that B.M.B. had presented evidence from which a jury reasonably could find that, due to a mental illness, Halliday had lacked the ability to control his conduct when he sexually abused B.M.B. The Court concluded that Wicka would apply under the facts of this case, giving rise to a jury question as to whether Halliday's acts could be deemed "unintentional" because of mental illness and, therefore, the policy's intentional act exclusion would not preclude coverage. The Court therefore denied State Farm's motion for summary judgment.

## II. NAMES AND ADDRESSES OF COUNSEL OF RECORD

Pursuant to subdivision 6(a)(4) of section 480.0665 of the Minnesota Statutes, this Court states that no parties have appeared without counsel, and that the names and addresses of the counsel of record are as follows:

### A. Plaintiff B.M.B.

Robert J. Hennessey (Atty. Reg. No. 44118)
Mark H. Zitzewitz (Atty. Reg. No. 289073)
LINDQUIST & VENNUM, PLLP

4200 IDS Center
80 South Eighth Street
Minneapolis, Minnesota 55402
Telephone: (612) 371-3211

**B. Defendant State Farm Fire and Casualty Company**

C. Todd Koebele (Atty Reg. No. 17287X)
William L. Moran (Atty. Reg. No. 177167)
MURNANE, CONLIN, WHITE & BRANDT, P.A.
444 Cedar Street, Suite 1800
Saint Paul, Minnesota 55101
Telephone: (651) 227-9411

## III. ORDER OF CERTIFICATION

The Clerk of Court is directed to forward this Order of Certification to the Supreme Court of the State of Minnesota under the official seal of this Court.

Dated: January 9, 2003

RICHARD H. KYLE
United States District Judge

**EXHIBIT A**

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

B.M.B.,

Plaintiff,

v.

State Farm Fire and Casualty Company,

Defendant.

Civ. No. 01-355 (RHK/AJB)
**MEMORANDUM OPINION AND ORDER**

---

Robert J. Hennessey and Mark H. Zitzewitz, Lindquist & Vennum P.L.L.P., Minneapolis, Minnesota, for Plaintiff.

C. Todd Koebele and William L. Moran, Murnane, Conlin, White & Brandt, Saint Paul, Minnesota, for Defendant.

---

## Introduction

Defendant State Farm Fire & Casualty Company ("State Farm") issued a personal liability umbrella policy to Ronald K. Halliday, III. In 1995, Halliday sought coverage under this umbrella policy after Plaintiff B.M.B.'s parents, on her behalf, commenced a civil action against him in state court arising from his sexual abuse of B.M.B. three years earlier, when she was ten. Following a jury verdict in B.M.B.'s favor, Halliday assigned his interests in the State Farm policy to B.M.B. She thereupon brought this lawsuit against State Farm, alleging that the insurance company had breached its contract in refusing to provide coverage for Halliday under the terms of the umbrella policy.

On September 30, 2002, this Court denied State Farm's Motion for Summary

FILED ___
RICHARD D. SLETTEN, CLERK
JUDGMENT ENTD ___
DEPUTY CLERK ___

Judgment. State Farm argued that (1) the policy contained an "intentional act" exclusion precluding coverage for personal injury that was "either expected or intended by [Halliday]," and (2) in Minnesota, the requisite intent for purposes of an intentional act exclusion is inferred as a matter of law in cases of non-consensual sexual contact. Therefore, State Farm contended, the intentional act exclusion applied and the company had no duty under the policy either to defend or to indemnify Halliday.

In deciding State Farm's motion, the Court considered State Farm Fire & Casualty Co. v. Wicka, 474 N.W.2d 324 (Minn. 1991), which held that

> for the purposes of applying an intentional act exclusion contained in a homeowner's insurance policy, an insured's acts are deemed unintentional where, because of mental illness or defect, the insured does not know the nature or wrongfulness of an act, or where, because of mental illness or defect, the insured is deprived of the ability to control his conduct regardless of any understanding of the nature of the act or its wrongfulness.

Wicka, 474 N.W.2d at 331. The Court determined that B.M.B. had presented evidence from which a jury reasonably could find that, due to a mental illness, Halliday had lacked the ability to control his conduct when he sexually abused B.M.B. The Court concluded that Wicka would apply under the facts of this case, giving rise to a jury question as to whether Halliday's acts could be deemed "unintentional" because of mental illness and, therefore, the policy's intentional act exclusion would not preclude coverage. The Court therefore denied State Farm's motion for summary judgment.

Presently before the Court is State Farm's Motion for Certification of Questions to the Minnesota Supreme Court Pursuant to Minn. Stat. § 480.065. State Farm asks the

Court to certify the following two questions:

> (1) In cases involving non-consensual sexual abuse by an insured, is intent inferred as a matter of law, or must the trier of fact determine whether "because of mental illness or defect, the insured does not know the nature or wrongfulness of an act, or where, because of mental illness or defect, the insured is deprived of the ability to control his conduct regardless of any understanding of the nature of the act or its wrongfulness," as set forth in State Farm Fire & Cas. Co. v. Wicka, 474 N.W.2d 324, 331 (Minn. 1991), so as to determine whether the insured's acts were intentional under the terms of the insurance policy; and
>
> (2) Under the Wicka analysis, must both the lack of cognition and the lack of volition on the part of the insured, because of mental illness, be established in order to defeat the application of an intentional act exclusion in an insurance policy.

For the reasons set forth below, the Court will grant the motion in part.

**Background**[1]

Halliday was a practicing anesthesiologist in Faribault, Minnesota.[2] B.M.B. is his niece and a current resident of Arizona. In June of 1992, Halliday sexually abused B.M.B., who was then ten years old, when she was visiting him, his wife, and their children in Faribault. At the time, he and his wife had an umbrella policy through State Farm.

In March 1994, Halliday's wife discovered him sexually abusing their eight-year-

---

[1] The following facts are taken from the Court's September 30, 2002 Memorandum Opinion and Order denying the parties' motions for summary judgment.

[2] The Minnesota Board of Medical Practice revoked Halliday's medical license after discovering a criminal conviction and other instances of sexual abuse. See B.L.H. v. Northwestern Mut. Life Ins. Co., 92 F. Supp. 2d 910, 912 (D. Minn 2000) (Alsop, J.) (giving factual background with respect to Halliday's medical license revocation).

old daughter. He was subsequently charged with three counts of criminal sexual conduct. He eventually pled guilty to one count. As part of his sentence, the state court ordered Halliday to complete sex offender treatment at Alpha Human Services ("Alpha House"). While in treatment, Halliday admitted to sexually abusing other girls, including B.M.B., and twenty-six female patients while they were under the effects of anesthesia. In a deposition, he described in detail the sequence of events that led him to abuse B.M.B. He admitted performing oral sex on B.M.B., and he conceded that such an act constituted sexual abuse. At Alpha House, Halliday was required to complete a questionnaire to move onto the next stage of treatment. In that questionnaire, he provided detailed answers regarding whom he had abused, why he abused children and women, how he felt when he abused his victims, and what he intended by his actions.

In June 1995, B.M.B.'s parents, on her behalf, (collectively "Claimants") commenced a civil lawsuit against Halliday in Rice County District Court. At the same time, Halliday's wife brought a similar suit against him relating to his abuse of their two daughters. In the underlying B.M.B. complaint, Claimants alleged seven causes of action against Halliday: (1) assault and battery; (2) incestuous abuse; (3) intentional infliction of emotional distress; (4) negligent infliction of emotional distress; (5) false imprisonment; (6) invasion of privacy; and (7) restitution for out-of-pocket expenses. (Id. Ex. 7.) Claimants brought the action as a result of Halliday's "physical and sexual abuse of [B.M.B.] when she was a minor child at the age of 10." They alleged that, at the time of

the abuse, Halliday had control over B.M.B. and that he "intentionally, maliciously, and with reckless disregard inflicted injury on B.M.B. through intentional, malicious, unjustified, harmful, and offensive sexual contact without her consent." (Id. ¶¶ 6, 9.)

Halliday sought coverage from State Farm under his umbrella policy as well his homeowner's policy. After completing an investigation, State Farm declined to provide coverage for Halliday under either policy. State Farm denied coverage, questioning whether (1) there had been a "loss" under the policy, (2) the alleged incidents had resulted in personal injury, and (3) the incidents were "expected or intended" by Halliday or were the result of "willful and malicious" acts by Halliday.

In Halliday's Answer to B.M.B.'s Complaint, he admitted his sexual contact with B.M.B. on one occasion. The state court consolidated B.M.B.'s case with the case that Halliday's wife filed on behalf of her daughters. At trial, Halliday testified that he had sexually abused both of his daughters and B.M.B. He also agreed that his actions showed that he acted with "willful indifference" to B.M.B. The jury returned a verdict against Halliday and awarded B.M.B. $100,000 in compensatory damages (later reduced by the court to $95,000) and $1,500,000 in punitive damages. The jury also awarded Halliday's daughters $1,950,000 in compensatory damages and $7,000,000 in punitive damages.

In this litigation, B.M.B. has presented expert testimony from Dr. Thomas Gratzer, a psychiatrist, opining that Halliday had psychiatric disorders at the time of his sexual abuse that prevented him from controlling his actions. Specifically, Dr. Gratzer provided

the following diagnosis and opinion:

> In my opinion, Mr. Halliday's aberrant sexual behaviors are a function of his sexual disorders. He shows a multiplicity of sexual disorders: pedophilia, voyeurism, paraphilic disorder n.o.s., and sexual disorder n.o.s. Mr. Halliday's offense pattern is consistent with his paraphilic disorders and indicates a substantial lack of control.

(Aff. of Mark H. Zitzewitz, Ex. B.)

**Analysis**

The choice of whether to certify a question to a state supreme court rests in the sound discretion of the federal court. Lehman Bros. v. Schein, 416 U.S. 386, 391 (1974). Minnesota has adopted the Uniform Certification of Questions of Law Act, pursuant to which "[t]he supreme court of [Minnesota] may answer a question of law certified to it by a court of the United States . . . if the answer may be determinative of an issue in pending litigation in the certifying court and there is no controlling appellate decision, constitutional provision, or statute of this state." Minn. Stat. § 480.065, subd. 3 (2002).

As set forth in the introduction, State Farm moves the Court for an Order certifying two questions. The first addresses whether, in cases in which an insured has engaged in non-consensual sexual contact with another, the trial court must infer an intent to cause injury as a matter of law or whether it may be proven that the insured's acts were "unintentional" for purposes of the policy's intentional act exclusion because the insured lacked the ability to understand the nature of his actions or control his actions due to mental illness. The second question addresses whether it must be shown that, due to

mental illness, the insured lacked *both* the ability to understand the nature of his actions *and* the ability to control his actions, or whether it is sufficient that he lacks *one or the other*. The Court applies the Act's two-part test to each question State Farm has proposed for certification.

**A. Whether an insured's mental illness can defeat the application of an insurance policy's intentional act exclusion in a case in which coverage is sought for injuries resulting from non-consensual sexual contact by the insured**

1. Is there no controlling appellate decision, constitutional provision, or Minnesota statute addressing this issue?

Neither party contends that a provision of the Minnesota Constitution or a Minnesota statute resolves the question of whether Minnesota law permits B.M.B. to present to a jury the argument that Halliday's inability to control his actions due to a mental illness renders his actions "unintentional" for purposes of the policy's intentional act exclusion. Rather, State Farm contends that there is no controlling appellate decision in Minnesota that applies the holding of Wicka in a case involving sexual abuse by an insured. B.M.B. responds that certification is not appropriate because the question of whether Wicka's holding applies in cases involving sexual abuse is not a close one that requires certification.[3] The Court disagrees with B.M.B.'s assessment, finding the

---

[3] "Absent a 'close' question and lack of state sources enabling a nonconjectural determination, a federal court should not avoid its responsibility to determine all issues before it." Shakopee Mdewakanton Sioux Community v. City of Prior Lake, 771 F.2d 1153, 1157 n.2 (8th Cir. 1985).

question of law closer than she contends.

A federal district court exercising diversity jurisdiction is bound only by state law as determined by the highest state court. Foy v. Klapmeier, 992 F.2d 774, 780 (8th Cir. 1993); see also Meyer v. Tenvoorde Motor Co., 714 F. Supp. 991, 995 (D. Minn. 1989) (Magnuson, J.) (stating that, in exercising diversity jurisdiction, federal courts are bound by the decisions of the state's highest court); Wilson v. Colonial Penn Life Ins. Co., 454 F. Supp. 1208, 1211 n.4 (D. Minn. 1978) (Alsop, J.) (stating that a federal court in a diversity action "is obligated to apply the state law as declared by the statute or by opinion of the state's highest court") (citing Erie R.R. v. Tompkins, 304 U.S. 64 (1938)). "Although federal courts are not bound to follow the decisions of intermediate state courts when interpreting state law, state appellate court decisions are highly persuasive and should be followed when the are the best evidence of state law." Baxter Int'l, Inc. v. Morris, 976 F.2d 1189, 1196 (8th Cir.1992), cited in Nelson Distrib., Inc. v. Stewart-Warner Indus. Balancers, 808 F. Supp. 684, 687 (D. Minn. 1992) (Alsop, J.); see also Bureau of Engraving, Inc. v. Federal Ins. Co., 5 F.3d 1175, 1176 (8th Cir. 1993) (stating that decisions of Minnesota's intermediate appellate court are not binding, but are persuasive authority, to be followed when they are the best evidence of Minnesota law.)

Nine years prior to Wicka, the Minnesota Supreme Court first addressed whether an insured's acts of non-consensual sexual contact with another fell within the scope of an insurance policy's intentional act exclusion. In Fireman's Fund Insurance Co. v. Hill,

314 N.W.2d 834 (Minn. 1982), the insured, James Hill, was a foster parent who sexually molested several foster children, including a minor male child who lived in the Hill home for fifteen months. The Minnesota Supreme Court found that "the nature of Hill's conduct was such that an intention to inflict injury can be inferred as a matter of law." Id. at 835. In reaching this inference, the supreme court set forth the following fundamental principles regarding the interpretation of intentional act exclusions in insurance policies:

> . . . this court has held that it is not sufficient that the act was intentional. *To be excluded from coverage, a person must have specifically intended to cause injury*, although intent to injure will be found even if the actual injury is different in kind or more severe than that intended. . . . In Caspersen v. Webber, 298 Minn. 93, 99, 213 N.W.2d 327, 330 (1973), we indicated that *an injury is "expected or intended" from the standpoint of the insured* if a reason for an insured's act is to inflict bodily injury or *when the character of the act is such that an intention to inflict an injury can be inferred as a matter of law.*

Id. (internal citations, quotation marks, and formatting omitted) (emphasis added). The foster father's protests "that he did not intend to harm the boy and that his actions were the result of his social and emotional immaturity," were irrelevant to the question of intent to cause injury. Id. The supreme court reasoned that Hill had intended to "engage in sexual play" and knew that the county welfare department disapproved of such activities and viewed such conduct as detrimental to the boy. Id. Furthermore, a psychiatrist testified, in response to a hypothetical question, that "if James Hill had been confronted with and warned of his activities with other children before having contact with the boy, then he must have realized that his sexual play with him was not in the boy's best

interest." Id.

Between the Minnesota Supreme Court's decisions in Hill and Wicka, a trio of opinions broadened the holding in Hill and established that "[i]n construing the 'intentional act' exclusion of liability insurance policies where the underlying claim is that the insured intentionally sexually assaulted the victim, an intention to inflict injury will be inferred as a matter of law." Estate of Lehmann by Lehmann v. Metzger, 355 N.W.2d 425, 426 (Minn. 1984) (inferring intent to cause injury where uncle repeatedly sexually assaulted niece when she was between twelve and sixteen years old); see also Horace Mann Ins. Co. v. Independent Sch. Dist. No. 656, 355 N.W.2d 413, 416 (Minn.1984) (inferring intent to cause bodily injury where high school teacher, coach, and chemical dependency counselor sexually abused female student on his basketball team whom he also counseled regarding drug abuse); State Farm Fire & Cas. Co. v. Williams, 355 N.W.2d 421, 424 (Minn. 1984) (inferring intent to cause bodily injury where college professor went to home of physically disabled adult male to teach computer skills and had repeated non-consensual sexual contact with him).

Seven years later, the Minnesota Supreme Court considered the following question of first impression: "When and under what circumstances does an insured's mental illness defeat the application of the intentional act exclusion?" Wicka, 474 N.W.2d at 329. To answer that question, the court examined "the existing principles of law in this state regarding insurance and the application of intentional act exclusions." Id. The Wicka

court started its analysis from the same place it had started in Hill: "[A]n intentional act exclusion applies only where the insured acts with the specific intent to cause bodily injury." Id.

> Under this subjective standard, the necessary intent may be established by proof of an insured's actual intent to injure or by inference, when the character of the act is such that an intention to inflict injury can be inferred as a matter of law. . . . The inference arises when the nature and circumstances of the insured's act were such that harm was substantially certain to result.

Id. The supreme court further observed that "*[w]hether proven directly or by inference*, the intent to cause bodily injury reflects the insured's state of mind about the desired harmful consequences of an action by the insured." Id. (emphasis added).

From these rules of law regarding the intentional act exclusion, the Wicka court determined that "[i]n describing the legal significance ascribed to an insured's actions, the concept of intent embodies the simultaneous presence of two abilities; one cognitive and the other volitional." Id. With respect to the cognitive element, Wicka evaluated three Minnesota cases upon which it had also based its holding in Hill: Woida v. North Star Mutual Insurance Co., 306 N.W.2d 570, 573 (Minn. 1981); Iowa Kemper Insurance Co. v. Stone, 269 N.W.2d 885, 887 (Minn. 1978), and Continental Western Insurance Co. v. Toal, 244 N.W. 2d 121, 125-26 (Minn. 1976). Although the insureds' mental capacity in those three cases had not been at issue, the Wicka court found that the inference of an intent to cause bodily injury had been warranted "because the insureds understood the obvious nature of their respective actions and the foreseeability of harm flowing from

those actions. Had these insureds not understood the nature of their acts, no inference could ensue." Id. at 329-30. The court also determined that the "cognitive" element of intent for insurance purposes – the individual's ability to understand the nature and wrongfulness of his actions – "parallels the cognitive capacity test in our criminal law." Id. at 330. The court in Wicka observed, however, that cognition was not the only factor relevant to intent for purposes of applying an insurance policy's intentional act exclusion. "An intent to cause bodily injury requires not only that the insured appreciate the nature and wrongfulness of his actions, but . . . also demands that the insured's actions be voluntary, originating from [the] insured's own free will." Id.

Recognizing that either the cognitive capacity or volitional capacity of an insured could be affected by the insured's mental illness, the supreme court held that

> for the purposes of applying an intentional act exclusion contained in a homeowner's insurance policy, an insured's acts are deemed unintentional where, because of mental illness or defect, the insured does not know the nature or wrongfulness of an act, or where, because of mental illness or defect, the insured is deprived of the ability to control his conduct regardless of any understanding of the nature of the act or its wrongfulness.

Id. at 331. Furthermore, the court in Wicka stated that "intent becomes a question for the trier of fact when the evidence suggests that the insured was not the master of his own will." Id. The Minnesota Supreme Court did not address in Wicka the effect of an insured's mental illness on the application of a policy's intentional act exclusion where the insured had engaged in non-consensual sexual contact with another. Nor did the supreme court state in Wicka that its holding applies differently – or not at all – in cases

in which one infers, as a matter of law, an intent to cause injury based on the nature and circumstances of the insured's acts.[4]

In opinions after Wicka, the Minnesota Supreme Court has not addressed whether, in a case in which the insured has engaged in non-consensual sexual contact with another, the insured's acts can be deemed unintentional because a mental illness or defect has deprived the insured of the ability to control his conduct. The supreme court has, however, held several times that a policy's intentional act exclusion bars coverage where the insured has perpetrated unwelcome or non-consensual sexual acts on another person. Auto-Owners Ins. Co. v. Todd, 547 N.W.2d 696, 699-700 (Minn. 1996) (holding that insured's false imprisonment of seventeen-year-old daughter was inextricably linked with and part of his overall intentional plan to sexually assault her and was therefore excluded from coverage under the intentional bodily harm exclusion in his homeowner's policy); R.W. v. T.F., 528 N.W.2d 869, 873 (Minn. 1995) (finding that insured's decision to engage in unprotected intercourse when he knew or should have know he had herpes and could transmit the disease through unprotected sex gave rise, as a matter of law, to an inference of intent to cause injury); Allstate Ins. Co. v. S.F., 518 N.W.2d 37, 40 (Minn. 1994) (holding that, where a woman was sexually assaulted by the insured and two other men in her apartment, "the sexual assaults alleged in the complaint surely cannot be

---

[4] State Farm provides no authority for the assertion that "[w]here intent to injure is inferred as a matter of law, the issue of intent to harm is conclusively established and is irrebuttable." (Def.'s Reply Mem. at 5.)

characterized as 'accidents' and . . . come within the intentional act exclusion of the policy"); D.W.H. v. Steele, 512 N.W.2d 586, 589 (Minn. 1994) (rejecting argument by insured that, because he was only eleven or twelve years old when he sexually assaulted another child, he could not form the requisite intent to cause injury and should be covered under the policy).

None of these supreme court cases involved the issue presented in Wicka: when and under what circumstances a policy's intentional act exclusion will not apply because the insured, *due to mental illness*, lacks the requisite intent to injure. Only one Minnesota case post-Wicka has come close to addressing that issue: Sara L. v. Broden, 507 N.W.2d 24 (Minn. Ct. App. 1993). For seventeen years, Broden engaged in a pattern of non-consensual sexual contact with his two grandchildren. 507 N.W.2d at 25. Broden was a diagnosed and admitted pedophile. Id. The insurance companies that issued Broden's policies denied coverage based on the policies' intentional act exclusions. Id. at 26. The district court found, as a matter of law, that Broden intended to injure his grandchildren and denied the grandchildren's motion for leave to file a supplemental complaint. Id. In affirming the district court, the court of appeals' reasoning, in its entirety, is as follows:

> L.S.L. and S.D.L. contend the district court erred in finding intent to cause injury as a matter of law and in refusing to allow them leave to file a supplemental complaint. We disagree. In Minnesota, intent to cause injury will be inferred as a matter of law in nonconsensual sexual contact cases. State Farm Fire & Cas. Co. v. Williams, 355 N.W.2d 421, 424 (Minn. 1984); Estate of Lehmann v. Metzger, 355 N.W.2d 425, 426 (Minn. 1984); Horace Mann Ins. Co. v. Independent School Dist. No. 656, 355 N.W.2d 413, 416 (Minn. 1984); Fireman's Fund Ins. Co. v. Hill, 314 N.W.2d 834,

> 835 (Minn. 1982); Illinois Farmers Ins. Co. v. Judith G., 379 N.W.2d 638, 641 (Minn. Ct. App. 1986), pet. for rev. denied (Minn. Mar. 21, 1986). We will not consider the subjective intent of the offender in such cases, even where the parties stipulated that the insured did not intend to inflict bodily injury or mental suffering. Williams, 355 N.W.2d at 423-24.
>
> L.S.L. and S.D.L. urge this court to create an exception to this rule, arguing that pedophiles do not intend to cause injury to their victims. We decline to create such an exception. This case is indistinguishable from Metzger and Hill, where the offenders were the victims' uncle and foster parent, respectively. Metzger, 355 N.W.2d at 426; Hill, 314 N.W.2d at 835. That the offender is an admitted pedophile does not alter our analysis.
>
> In so holding, we reject L.S.L. and S.D.L.'s argument that pedophilia is a mental illness that precludes a finding of intent. Further, we find their invocation of public policy does not justify reversal.

Id. The Minnesota Supreme Court denied review. Id. at 24.

Broden does not clarify or illuminate the question of whether, under Wicka, one can present to a jury the argument that an insured who has committed non-consensual sexual acts on another has a mental illness that prevents him from being able to control his actions, such that his acts are "unintentional" for purposes of an intentional act exclusion. The court of appeals does not *mention* Wicka, let alone analyze the supreme court's holding in light of Broden's circumstances. Broden is not the best evidence of Minnesota law and is not persuasive with respect to the issue before this Court. Therefore, the Court rejects Broden as "controlling appellate authority."

Broden cryptically referred to a public policy argument made by the grandchildren, which the court of appeals rejected without explanation. In considering the public policy implications raised by B.M.B.'s argument under Wicka, the Court observes that public

policy played a notable role in the supreme court's analysis in Wicka:

> The law in Minnesota strikes a delicate balance between societal and individual interests when dealing with the rights and responsibilities of the mentally ill. See Minn. Const. art. VII, § 1 (insane or mentally incompetent persons ineligible to vote); Minn. Stat. § 595.02(f) (1990) (person of unsound mind incompetent to testify); Minn. Stat. § 611.026 (1990) (excusing criminal liability where the actor, because of mental illness, did not know the nature of the act or that it was wrong); see also Meils v. Northwestern Bell Telephone Co., 355 N.W.2d 710, 714 (Minn. 1984) (suicide compensable under Workers' Compensation Act where injury causes mental derangement of such severity that it overrides normal, rational thinking and judgment); Anderson v. Armour & Co., 257 Minn. 281, 101 N.W.2d 435 (1960); Olsson v. Midland Ins. Co., 138 Minn. 424, 430, 165 N.W. 474, 476 (1917) (allowing recovery under accidental death policy where the insured's suicide was a product of insured's insanity).

Wicka, 474 N.W.2d at 330-31.

In addition to the public policy concerns raised by rules of law that affect the rights and responsibilities of the mentally ill, the Minnesota Supreme Court has also considered public policy concerns arising from the possibility that an insurance company will be required to indemnify for an insured's criminal acts. In D.W.H., for example, the supreme court held that the Minnesota Joint Underwriting Association was not obligated to defend or indemnify a foster care resident who, at age eleven, had physically and sexually abused another child at the foster home. In reaching its holding, the court noted several provisions in the policy excluding coverage for personal or bodily injury arising out of "the willful violation of a penal statute," "the actual, alleged or threatened sexual molestation of a minor by any insured," or a "criminal or malicious act." Furthermore, the policy expressly "disavowed the duty to defend any claim or suit involving sexual

molestation of a minor." The supreme court stated that, while it had not previously considered "the validity of the intentional act exclusions contained in the MJUA policy, we have held them valid in other contexts and are persuaded that the public policy favoring such exclusions is equally applicable here." 512 N.W.2d at 589; see also R.W. v. T.F., 528 N.W.2d at 873 (stating that it will not "promote the abdication of personal responsibility by providing insurance coverage when an insured engages in unprotected sexual intercourse despite having knowledge that he is infected with herpes, a highly contagious and serious sexually transmitted disease," noting that several other states have criminalized the transmission of infectious diseases).

In the instant case, Halliday sexually abused B.M.B. when she was a ten-year-old child. B.M.B. has presented evidence from which a jury reasonably could find that he was unable to control his acts due to mental illness. B.M.B. seeks to prove that Halliday's acts were "unintentional" as set forth in the holding of Wicka and, therefore, the policy's intentional act exclusion does not apply. The undersigned notes that the Minnesota Supreme Court reiterated, after Wicka, that "[t]he determination to infer intent as a matter of law results from a case-by-case factual inquiry, not a bright line rule of law." R.W., 528 N.W.2d at 873. The Court concludes that there is no controlling appellate authority in Minnesota governing the following question of law:

> Where insurance coverage is being or has been sought for personal injury or bodily harm resulting from an insured's non-consensual sexual contact with another, can the court submit to a jury the question of whether the insured's acts were "unintentional" because of mental illness as set forth in the

holding of State Farm Fire & Cas. Co. v. Wicka, 474 N.W.2d 324 (Minn. 1991), and therefore outside the scope of an insurance policy's intentional act exclusion, or must the court infer the insured's intent to cause injury as a matter of law?

2. Will the answer determine an issue in pending litigation in this court?

The application of the policy's intentional act exclusion is dispositive of B.M.B.'s lawsuit. If the intentional act exclusion applies, State Farm did not breach the insurance contract by refusing to defend or to indemnify Halliday. B.M.B. intends to argue that the intentional act exclusion does not apply in this case because Halliday suffered from a mental illness that deprived him of the ability to control his actions when he abused her. If, as a matter of law, such an argument cannot be made and evidence in support of that argument cannot be presented to a jury, State Farm is entitled to summary judgment. Accordingly, an answer to the question set forth at the end of this section would resolve a dispositive issue in this litigation.

**B Whether a person seeking to prove that the insured's acts were "unintentional" within the meaning of Wicka must show that the insured lacked both a volitional and a cognitive ability to form intent with respect to the insured's acts.**

With respect to the second issue presented in its motion, State Farm has asked the Court to determine that there is some ambiguity in Wicka as to whether an insured must lack *both* volitional capacity *and* cognitive capacity in order for their acts to be deemed "unintentional." The Court has set out at length, supra, the supreme court's reasoning in Wicka and finds no basis for State Farm's proposed reading of the case. It is clear from

the holding of Wicka itself that if an insured lacks *either* the cognitive aspect *or* the volitional aspect of intent due to a mental illness, the insured's acts will be deemed "unintentional" for purposes of applying an intentional act exclusion. The Court concludes that there is no need to certify the second question requested by State Farm.

## Conclusion

Based on the foregoing, and all of the files, records, and proceedings herein, **IT IS ORDERED** that Defendant State Farm Fire and Casualty Company's Motion to Certify Questions to Minnesota Supreme Court (Doc. No. 101) is **GRANTED IN PART.** Pursuant to Minn. Stat. § 480.065, subd. 3, the following question will be certified to the Minnesota Supreme Court:

> Where insurance coverage is being or has been sought for personal injury or bodily harm resulting from an insured's non-consensual sexual contact with another, can the court submit to a jury the question of whether the insured's acts were "unintentional" because of mental illness as set forth in the holding of State Farm Fire & Cas. Co. v. Wicka, 474 N.W.2d 324 (Minn. 1991), and therefore outside the scope of an insurance policy's intentional act exclusion, or must the court infer the insured's intent to cause injury as a matter of law?

A separate Order of Certification will follow.

Subdivision 6(a)(2) of section 480.065 requires that the Order of Certification include "the facts relevant to the question, showing fully the nature of the controversy out of which the question arose." Subdivision 6(b) further states that "[i]f the parties cannot agree upon a statement of facts, the certifying court shall determine the relevant facts and state them as a part of its certification order."

Accordingly, **IT IS FURTHER ORDERED** that the parties shall **MEET AND CONFER**, either in person or by telephone, prior to ***December 17, 2002***, regarding a proposed statement of facts for the certification order, understanding that the Court intends to submit to the Minnesota Supreme Court, at a minimum, the facts set forth in the Background section of this Memorandum Opinion and Order.

**IT IS FURTHER ORDERED** that, on or before Friday, ***December 27, 2002***, the parties shall submit to the Court either (1) an agreed, joint statement of facts or (2) a statement of agreed-upon facts together with separate submissions of additional facts upon which the parties cannot agree or (3) separate proposed statements of facts. All statements of facts submitted to the Court shall be supported by citations to the record. There will be no opportunity for responses to the proposed statements of fact.

**IT IS FURTHER ORDERED** that all further proceedings in this matter, except as directed above, are **STAYED** pending further order of the Court.

December 4, 2002

RICHARD H. KYLE
United States District Judge